IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHOLIC HEALTHCARE WEST, | CASE NO. CV F 05-0415 LJO |
| Plaintiff, | **DECISION ON REVIEW OF ADMINISTRATIVE MEDICARE RATE DETERMINATION** |
| vs. | (Docs. 22, 23, 28.) |
| MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services, | |
| Defendant. | |

**INTRODUCTION**[1]

Plaintiff Catholic Healthcare West ("CHW") seeks to set aside a U.S. Department of Health and Human Services' ("HHS'") decision setting CHW's Medicare reimbursement rate for kidney dialysis treatment at $175.31 although CHW claims its reasonable cost per treatment is $272.76. HHS asks this Court to affirm the HHS decision to set the $175.31 Medicare reimbursement rate.[2]

This Court reviewed the HHS rate decision on record, including the parties' extensive briefing,

---

[1] Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties consented to proceed before a United States Magistrate Judge, and by an August 8, 2005 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all further proceedings.

[2] Although the parties styled their papers as cross-motions for summary judgment, the purpose of this action is to review a final administrative decision, pursuant to standards discussed below, not F.R.Civ.P. 56 standards. *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.

1

and without the May 19, 2006 hearing or oral argument, pursuant to this Court's Local Rule 78-230(h). For the reasons discussed below, this Court AFFIRMS the final HHS rate decision and DENIES CHW's requested relief.

## BACKGROUND

### Overview Of Medicare ESRD Reimbursement And Rate Exceptions

End Stage Renal Disease ("ESRD") is an irreversible kidney impairment which requires blood filtering dialysis or kidney transplant. CHW operates Mercy Hospital, a 278-bed acute facility in Bakersfield and which provided outpatient dialysis service through its dialysis unit.[3] The unit operated near capacity to treat 14 ESRD patients daily.

Medicare is a health insurance program for the aged and disabled and was administered by the Health Care Financing Administration ("HCFA").[4] *See* 42 U.S.C. §§ 1395c, 1395kk. Medicare covers outpatient dialysis for ESRD patients. 42 U.S.C. § 1395rr(a); 42 C.F.R. § 406.13.[5] Through HCFA, HHS provides Medicare reimbursements to providers, including CHW, for outpatient ESRD treatments for qualifying Medicare patients. HHS adopted regulations for reimbursement of outpatient ESRD services based on a "composite" or prospectively determined per treatment rate. The rate is based on the median cost per treatment of a sample of hospital-based and free-standing facilities. *See* 42 C.F.R. § 413.170.

Pursuant to 42 U.S.C. § 1395rr(b)(7) and 42 C.F.R. §§ 413.170(f), (g), HCFA may grant ESRD treatment providers an exception to the standard composite rate of reimbursement. Under 42 C.F.R. § 413.170, a provider may request HCFA to approve an exception to the composite rate and to set a higher per treatment rate if it demonstrates that "excess" costs are attributable to criteria, including "atypical" ESRD services, special dialysis procedures, or supplies that are medically necessary to meet special needs patients. A provider may request a composite rate exception by filing a request with its Medicare

---

[3]   For ease and convenience, "CHW" will also refer to and include Mercy Hospital in Bakersfield.

[4]   Since the events at issue, HCFA was renamed Centers for Medicare and Medicaid Services ("CMS"). For ease and convenience, "HCFA" will also refer to and include CMS despite the name change.

[5]   All references to 42 U.S.C. § 1395rr and sections of Title 42 of the Code of Federal Regulations are to their respective versions in effect in 1993 when CHW submitted its dialysis treatment rate request at issue here.

fiscal intermediary. Fiscal intermediaries are private organizations which pay Medicare providers and administer the Medicare program through HHS contracts. Fiscal intermediaries review and make recommendations on rate exception requests and forward requests to HCFA, the agency responsible for Medicare administration. If HCFA does not deny a rate exception request within 60 working days, the rate exception request is deemed approved. 42 C.F.R. § 413.182(h).

To receive a rate exception, a provider must show:

1. "[O]n the basis of prior year costs and utilization trends," that it will have a per treatment cost exceeding the composite rate, 42 C.F.R. § 413.180(b); and

2. Excess costs are reasonable and allowable and that per treatment costs exceeding the composite rate are attributable to designated criteria outlined in 42 C.F.R. §§ 413.182, 413.180(b).

CHW sought a rate exception on grounds that it provided atypical ESRD services. A rate exception based on "atypical service intensity" requires a showing that:

> A substantial portion of the facility's outpatient maintenance dialysis treatments involve atypically intense dialysis services, special dialysis procedures, or supplies that are medically necessary to meet medical needs of the facility's patients. The facility is able to demonstrate clearly that these services, procedures or supplies and its per treatment costs are prudent and reasonable when compared to those facilities with a similar patient mix. Examples that may qualify under this criterion are more intense dialysis services that are medically necessary for patients such as –
>
> ( i ) patients who have been referred from other facilities on a temporary basis for more intense care during a period of medical instability, and who return to the original facility after stabilization;
>
> (ii) pediatric patients, who require a significantly higher staff-to-patient ratio than typical adult patients; or
>
> (iii) patients with medical conditions that are not commonly treated by ESRD facilities, and that complicate the dialysis procedure.

42 C.F.R. § 413.184(a)(1).

Under 42 C.F.R. § 413.180(g), the provider bears the burden to prove that the atypical service intensity criteria are met and that the excessive costs are justifiable under the reasonable cost principles of 42 C.F.R. Part 413.

### Overview Of Administrative And Judicial Review

A provider may seek Provider Reimbursement Review Board ("PRRB") review of an HCFA

1  decision to deny a rate exception request. PRRB conducts administrative hearings and issues decisions
2  on Medicare payment disputes. 42 U.S.C. § 1395oo. PRRB considers whether HCFA's decision was
3  proper under the regulations based on information submitted with the provider's rate exception request.
4  *See* 42 C.F.R. § 413.194. A provider may not submit "additional information or cost data that had not
5  been submitted to HCFA at the time HCFA evaluated the exception request." 42 C.F.R. §194(c). PRRB
6  reviews an HCFA decision on the record before HCFA.

7        A PRRB decision is subject to review by the HCFA Administrator, which may reverse, modify
8  or adopt the PRRB decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 1875. The HCFA Administrator's
9  decision, or that of the PRRB if the HCFA Administrator declines review, is the final HHS decision
10 subject to district court review. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.

11         **CHW's ESRD Rate Exception Request**

12       In October 1993, HCFA notified CHW that CHW's composite rate for outpatient ESRD services
13 would be $134.53 per treatment. At that time, HFCA allocated the following median costs per
14 treatment: $40 for salaries; $33 for supplies; $47 for overhead excluding employee benefits; $7 for
15 employee benefits; and $3 for lab costs. On March 25, 1994, CHW submitted to its fiscal intermediary
16 a rate exception request for $272.76 per dialysis treatment on grounds that it furnished ESRD services
17 on an atypical density. CHW's $272.76 rate exception request comprised:

18       $86.02 – Salaries
        38.60 – Supplies
19      111.96 – Overhead (excluding employee benefits)
      28.88 – Employee benefits
20        7.31 – Lab
     $272.76 – Total
21

22 CHW claimed that $272.76 represented its ESRD cost per outpatient dialysis treatment based on its
23 Medicare cost report for fiscal year ending June 30, 1993.

24       As to atypical service density and increased costs, CHW noted that:

25     1.    CHW's dialysis unit treated an older patient population with 71 percent over age 55,
26         compared to a 64 percent national average;

27     2.    58 percent of CHW's ESRD patients had a primary diagnosis of diabetic nephropathy,
28         compared to a 30 percent national average;

3. CHW's mortality rate for ESRD patients was higher than ususal;

4. The vast majority of CHW's ESRD patients were bedridden, and CHW was the sole local dialysis unit with beds to accommodate such patients;

5. All of CHW's dialysis unit patients had prescription dialysis to require more time to collect supplies and prepare concentrate;

6. More than 77 percent of CHW's dialysis patients had cardiac complicating conditions; and

7. None of CHW's patients dialyzed at home.

After its review of CHW's rate exception request, the fiscal intermediary recommended for CHW a $244.78 per treatment rate. The fiscal intermediary recommended $83.98 per treatment for overhead costs rather than $111.96 requested by CHW to account for $27.98 less than CHW's requested rate exception.

HCFA did not accept the fiscal intermediary's recommendation and granted CHW a $175.31 per treatment rate exception with its May 31, 1994 letter. The $175.31 rate exception comprises the $134.53 composite rate plus additions of $32.59 for salary costs, $6.09 for benefits related to additional salary, and $2.10 for supply costs. Including composite rate amounts, HCFA allocated $72.59 for salary and $35.10 for supply costs. As to salary, HCFA excluded the lead ESRD nurse's salary as an overhead cost not part of the national salary median. HCFA limited employee benefits cost to the national average of 18.7 percent of salary costs ($32.59 multiplied by 18.7 percent equals $6.09). HCFA rejected CHW's request for additional amounts for overhead and laboratory costs and explained:

> Although, the provider documented that its patient population is atypical, it must also show that each element of excessive costs is specifically attributable to the exception criterion, 42 CFR 413.170(f)(g)(iii). [CHW] did not furnish any justification to relate its excessive laboratory and overhead costs to the atypical exception criterion. General statements that excessive costs are related to the exception criterion do not meet the requirements of the regulation. In reviewing the provider's exception request, we did not approve any amounts for overhead or laboratory.

### PRRB's Decision On CHW's Rate Exception Request

CHW appealed HCFA's decision to PRRB, which after a November 19, 2004 evidentiary hearing, issued its November 19, 2004 decision to grant CHW a $221.75 per treatment rate comprising $85.02 for salaries, $35.10 for supply costs, $70.31 for overhead excluding employee benefits, $27.32

for employee benefits, and $3 for lab costs.[6] PRRB found:

1. CHW's treatment rate should be increased for the reasonable salary cost of the ESRD lead nurse;

2. CHW's use of its actual employee benefits rate of 31.76 percent was reasonable and HCFA lacked authority to limit CHW's fringe benefit rate to the 18.7 percent national median;

3. CHW is entitled to an increase in overhead costs (excluding employee benefits) and a direct link of such costs to atypicality of patients is impossible; and

4. No documentation supported CHW's requested increase of $3.50 per treatment for supplies and $4.31 per treatment for lab costs.

## HCFA Administrator Review

With its December 6, 2004 letter, the HCFA Administrator provided its notice to review PRRB's decision. CHW submitted to the HCFA Administrator a letter brief to support CHW's position. With its January 19, 2005 decision, the HCFA Administrator determined that CHW "serves an atypical patient mix population" and found:

1. *Lead Nurse Salary*: HCFA properly had excluded $13.43 from CHW's rate exception request for $86.02 for salaries per treatment since HCFA "could not determine from the exception request which job description the management salary was related to, and whether the individual to whom the management salary pertained furnished direct patient care." The HCFA Administrator noted that HCFA had excluded the $13.43 management salary cost as overhead costs which were excluded from calculation of the $40 national median;

2. *Employee Benefits*: CHW is not entitled to $28.88 for employee benefits per treatment because CHW failed to demonstrate that its costs in excess of the national average benefits rate of 18.7 percent were attributable to patient population and failed to provide documentation to link excessive employee benefits cost above the 18.7 percent granted

---

[6] This Court notes that PRRB's allocation of costs equals $220.75, not $221.75 stated in its decision.

6

by HCFA;

3. *Overhead Costs*: CHW "failed to substantiate that excess overhead costs related to [CHW's] atypical patients" and CHW's "general contention that certain overhead costs must follow higher direct costs is contrary to the specific [Medicare] requirements"; and

4. *Supply and Lab Costs*: PRRB correctly limited increased supply costs to $35.10 per treatment and correctly denied CHW's request for additional supply and laboratory costs.

The effect of the HCFA Administrator's decision was to set CHW's rate exception at $175.31 per treatment. The HCFA Administrator's decision is final for HHS and subject to this Court's review. With this action, CHW challenges what it characterizes as a "modest" increase beyond the composite rate for ESRD services and seeks a higher ESRD rate exception.

## DISCUSSION

### Standard Of Review Of The HCFA Administrator's Decision

CHW's challenge of the HCFA's Administrator's decision proceeds under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, et seq. The APA is incorporated by the Social Security Act, *see* 42 U.S.C. § 1395oo(f)(1), and commands reviewing courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Although the arbitrary and capricious standard is narrow, a reviewing court must "engage in a substantial inquiry[,] . . . a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-416, 91 S.Ct. 814 (1971), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980 (1977). To avoid arbitrary and capricious action, an agency must present a "rational connection between the facts found and the conclusions made." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 384 F.3d 1163, 1170 (9th Cir. 2004).

A reviewing court "is not empowered to substitute it judgment for that of the agency." *Volpe*, 401 U.S. at 416, 91 S.Ct. at 824. A reviewing court "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386 (1994). A reviewing court is not to decide which competing interpretation best serves the regulatory purpose. *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. at 2386. Rather, an agency's interpretation must be accorded "controlling weight unless it is plainly erroneous or inconsistent with

the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2386; *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217 (1945). A reviewing court must defer to an agency's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. at 2386-2387; *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 1314 (1988); *see SSM Rehabilitation Institute v. Shalala*, 68 F.3d 266, 269 (8th Cir. 1995) (HHS and a provider's "conflicting interpretations do not compete on a level playing field" in that a court must defer to HHS interpretation of reimbursement regulations). Such broad deference is more warranted when the regulation concerns "a complex and highly technical regulatory program," in which identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. At 2387; *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697, 111 S.Ct. 2524, 2534 (1991). Moreover, a reviewing court "is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme, and not to give force to one phrase in isolation." *Campesninos Unidos, Inc. v. U.S. Dept. Of Labor*, 803 F.2d 1063, 1069 (9th Cir. 1986).

Despite deference to an agency, a reviewing court must not abdicate its "responsibility to review agency action under the regulations promulgated":

> As this Court has noted, we must "examine the interpretation itself in light of the language of the regulations. The words must be reasonably susceptible to the construction placed on them by the [agency], both on their face and in light of their prior interpretation and application. *The interpretation must sensibly conform to the purpose and wording of the regulations.*"

*St. Elizabeth Community Hosp. v. Heckler*, 745 F.2d 587, 592 (9th Cir. 1984) (italics in original; quoting *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980)).

A reviewing court examines an agency's decision to determine whether the decision is based on "substantial evidence." 5 U.S.C. § 706. Under the substantial evidence standard of review, the evidence relied upon by the agency to reach it determination must be "something more than a mere scintilla . . . [, meaning] "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)*; Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619-620, 86 S.Ct. 1018, 1026 (1966), even if two

inconsistent conclusions may be drawn from the evidence, *Illinois Central Railroad Co. v. Norfolk & Western Railway Co.*, 385 U.S. 57, 69, 87 S.Ct. 255, 262 (1966). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 338 U.S. at 620, 86 S.Ct. at 1026.

With these standards in mind, this Court turns to CHW's criticisms of the HCFA Administrator's decision.

## Compliance With Regulatory Scheme

CHW broadly argues that the HCFA Administrator held CHW to standards beyond the regulations to justify its ESRD rate exception. CHW contends that HHS's findings on CHW's rate exception request "are erroneous because [HHS] applied an overly exacting interpretation of the term 'specifically attributable,'" as used in 42 C.F.R. § 413.170(f)(6)(iii). According to CHW, HHS has arbitrarily and capriciously "established a burden of proof that is **impossible** to meet with respect to most items of increased costs" in that "providers should not be required to prove a direct, but-for relationship between all items of increased costs and the applicable exception criterion." (Bold in original.) CHW asserts that "providers should be granted additional payment if they can establish a relationship between their increased costs and their atypical services using Medicare cost reimbursement principles."

42 C.F.R. § 413.170(f)(5) addresses the burden of proof for a rate exception:

> The facility is responsible for demonstrating to HCFA's satisfaction that the requirements of this section [for a rate exception] . . . are met in full. That is, the burden of proof is on the facility to show that one or more of the criteria are met, and that the excessive costs are justifiable under the reasonable cost principles set forth in this part. The burden of proof is not on HCFA to show that the criteria are not met, and that the facility's costs are not allowable.

To determine a rate exception, HCFA "will exclude all costs that are not allowable under the reasonable cost principles." 42 C.F.R. § 413.170(f)(8).

As to recordkeeping and reporting requirements, 42 C.F.R. § 413.174(b)(1) requires: "Each facility must keep adequate records and submit the appropriate HCFA-approved cost report in accordance with [42 C.F.R.] §§ 413.20 and 413.24, which provide rules on financial data and reports, and adequate cost data and cost finding, respectively." Continuing on, 42 C.F.R. §413.174(b)(3)

addresses allowable costs:

> Allowable cost is the reasonable cost related to dialysis treatments. Reasonable cost includes all necessary and proper expenses incurred by the facility in furnishing the dialysis treatments, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans. It includes both direct and indirect costs and normal standby costs.

CHW argues that these Medicare regulations read together "establish that ESRD providers are expected only to abide by generally applicable Medicare rules for reporting and documenting costs. General Medicare cost reporting principles do not require that providers directly link certain costs with services rendered." CHW asserts that HHS' application of the regulatory scheme for rate exceptions "places an impossible burden on providers to justify their increased costs."

HHS responds that the HCFA Administrator's interpretation was "consistent with the regulatory scheme which expressly requires that an exception may be approved only if it can be demonstrated with convincing objective evidence that the costs in excess of the payment rate are specifically and directly attributable to the atypical mix." More specifically, HHS argues that to obtain a rate exception, an ESRD provider must demonstrate that:

1. "[O]n the basis of prior year costs and utilization trends," that the provider will have a per treatment cost exceeding the general payment rate, 42 C.F.R. § 413.180(b); and

2. Excess costs are reasonable and allowable and attributable to specific criteria, in this case, atypical patient mix, 42 C.F.R. § 413.182.

Since CHW sought a rate exception based on atypical service intensity, the governing regulation, 42 C.F.R. § 413.170(g), required CHW to demonstrate "with clear and convincing objective evidence that its total per treatment costs are reasonable and allowable under [42 C.F.R.] §413.174, and that its per treatment costs in excess of its payment rate are directly attributable" to the atypical patient mix criteria. 42 C.F.R. § 413.170(f)(6) addresses procedures to request a rate exception and necessary information and states in pertinent part:

> . . . a facility must submit to HCFA its most recently completed cost report as required under [42 C.F.R.] § 413.174, and whatever statistics, data, and budgetary projections are determined by HCFA to be needed to determine if the exception is approvable. HCFA may audit any cost report or other information submitted. The materials submitted to HCFA must –
>
> ( i ) Separately identify elements of cost contributing to costs per treatment in excess

of the facility's payment rate;

(ii) Show that all of the facility's costs, including those costs that are not directly attributable to the exception criteria, are allowable and reasonable under the reasonable cost principles set forth in this part;

(iii) Show that the elements of excessive cost are **specifically attributable** to one or more conditions specified by the criteria set forth in paragraph (g) of this section; and

(iv) Specify the amount of additional reimbursement per treatment the facility believes is required in order to recover its justifiable excess costs. (Bold added.)

The Medicare regulations define the procedures and information necessary for a rate exception. CHW fails to substantiate its sweeping claim that HHS misapplied its regulatory scheme here. Congress envisioned a regulatory scheme to "more effectively encourage the more efficient delivery of dialysis services" and mandated HHS to provide rate exceptions "as may be warranted by unusual circumstances." 42 U.S.C. § 1395rr(b)(7). CHW's hyperbole with insufficient substance fails to demonstrate the unreasonableness which CHW attempts to attach to the rate exception regulations and application of them. CHW fails to define how and the means to which HHS "is effectively negating the entire exception process."

As noted by HHS, the burden to demonstrate a rate exception request is not light. Under 42 C.F.R. § 413.170(f)(6), a provider, such as CHW, must provide necessary "statistics, data, and budgetary projections" and "elements of cost contributing to costs per treatment in excess of the facility's payment rate." The regulation further requires a provider to demonstrate that its costs "are allowable and reasonable" and that "elements of excessive cost are specifically attributable" to the atypical patient mix. The regulation provides that a "substantial proportion of the facility's outpatient maintenance dialysis treatments involve atypically intense dialysis services, special dialysis procedures, or supplies that are **medically necessary** to meet special medical needs of the facility's patients." 42 C.F.R. § 413.170(g)(1) (bold added). As to atypical patient mix, a provider must demonstrate "clearly that these services, procedures or supplies and its per treatment costs are prudent and reasonable when compared to those of facilities with a similar patient mix." 42 C.F.R. § 413.170(g)(1).

The Medicare Provider Reimbursement Manual ("PRM") reinforces the burden on a provider and contains HHS interpretive rules to advise the public of HHS construction of its statutes and rules. PRM section 2720.1 notes that "HCFA may approve an exception to an ESRD facility's composite rate

payment if the facility demonstrates with convincing evidence (see 42 CFR 413.170(f)(5)) that its total estimated per treatment costs are reasonable and allowable." PRM section 2721.B. continues:

> The facility must provide written justification for supporting the facility's higher cost. The fact that a facility projects costs higher than its composite rate payment is not adequate documentation for granting an exception. The facility must provide HCFA with supporting material documenting the reasons that may justify its costs in excess of its composite payment rate(s). In addition, the facility must separately identify those items and services that are in excess of the composite payment rate.

As noted by HHS, 42 C.F.R. § 413.174, relied upon by CHW, addresses recordkeeping and cost reporting requirements for outpatient dialysis without reference to a provider's burden of proof for a rate exception. HHS correctly notes that recordkeeping and cost reporting requirements "do not expressly mandate that the same principles of cost allocation and cost apportionment are to be used to determine which costs in excess of the payment rate are directly attributable to atypical patients." CHW fails to demonstrate why the HHS Administrator's application of the rate exception regulatory scheme is not entitled to deference.

With the above regulations in mind, this Court turns to the items for which CHW seeks higher costs.

### **Lead Nurse Salary**

As part of CHW's $272.76 rate exception request, CHW allocated $86.02 to salaries, including $13.43 for a lead nurse. The HCFA Administrator excluded the $13.43 lead nurse salary as an overhead cost which is excluded from the $40 national median.

CHW contends that the HCFA Administrator arbitrarily and capriciously excluded the lead nurse's salary from the management component of CHW's ESRD rate and points out that the lead nurse assisted "quite often" with patient care. CHW complains that HHS never has provided notice "that the salary component of ESRD treatment only extends to direct patient care and should not include management salaries." CHW further challenges that HHS failed to demonstrate that the $40 median "was determined exclusive of management salaries."

In response, HHS points to CHW's rate exception request submitted in 1994 and argues CHW failed to adequately define a head nurse/manager. HHS further argues that CHW's rate exception request "lacked any documentation that would permit [HCFA] to substantiate the amount of direct

patient care that might have been furnished by the individual to whom this particular salary pertained." HHS notes that CHW relied on nursing service hours per treatment for its rate exception request but failed to provide convincing objective data that the lead nurse "experienced higher nursing service hours due to the atypical patient mix."

PRM section 2725.1.B. provides guidance on nursing service hours per treatment:

> The provider must submit data which demonstrate that its patients will receive significantly more nursing (refers to RNs, LPNs, technicians, and aides) hours (based on total hours as explained in §2721.B.1.e.) per treatment than patients receive in other facilities. The increased hours of nursing service must be justified by data that demonstrate the higher hours per treatment and thus the higher per treatment costs are necessitated by the special needs of the patients such as those referred to in the above listing. For example, documentation must show that higher per treatment costs are incurred because of increased nursing hours resulting from services furnished to a substantial number of patients with more complex medical needs or that more nursing care results in fewer inpatient admissions.

Once again, CHW rests on generalizations and fails to demonstrate precisely how the HCFA Administrator wrongly excluded $13.43 for the lead nurse. CHW fails to explain how a $13.43 lead nurse's salary cost was necessitated by an atypical patient mix, patient special needs or increased management. HHS points to specific deficiencies, which prevented CHW to meet its burden. CHW ignores that the HCFA Administrator excluded the $13.43 as management salary because HCFA "could not determine from the rate exception request which job description the management salary was related to, and whether the individual to whom the management salary pertained furnished direct patient care." The fault here rests with CHW, not components of the $40 salary national median in that CHW bore the burden to demonstrate that excess costs arise from rate exception criteria (atypical patient mix). Moreover, as noted by HHS, the lead nurse's salary was a fixed cost independent of the number of atypical patients or related difficulties. This Court finds no error in the HCFA Administrator's evaluation of the lead nurse salary.

### Employee Benefits

As part of CHW's $272.76 rate exception request, CHW allocated $28.88 for employee benefits. The HCFA Administrator found that CHW is not entitled to the entire $28.88 for employee benefits because CHW failed to demonstrate that is costs exceeding the national average benefits rate of 18.7 percent were attributable to patient population and failed to provide documentation to link excessive

employee benefits cost above the 18.7 percent ($6.09) granted by HCFA.

CHW contends that limitation of employee benefits to 18.7 percent of the amount of salaries, or $6.09, is improper in the absence of evidence to support the 18.7 percent employee benefits factor and is inconsistent with Medicare regulations. CHW points out that the 18.7 percent median is based on data collected years prior to 1994.

CHW relies on *Univ. of Cincinnati v. Shalala*, 867 F.Supp. 1325 (S.D. Ohio 1994), where the district court addressed the employee benefits rate of 18.7 percent which HHS claimed to be the national average benefit rate for ESRD facilities included in the composite rate. The district court found that HHS did not arbitrarily or capriciously limit the plaintiff provider's employee benefits increase to the national 18.7 percent rate.[7] However, the district court criticized HHS "automatic acceptance of 18.7 percent as the 'appropriate national, benefits-to-salary average'" and ordered an evidentiary hearing to address the rate's propriety. *Univ. of Cincinnati*, 867 F.Supp. at 1331-1332. The district court commented:

> The record reveals that the data used to configure the fringe benefits rate was collected as far back as 1979. . . . In view of the passage of more than 10 years, there is a question whether the 18.7 ratio is anymore valid if HCFA were to pick a number out of a hat. This is especially the case with regard to fringe benefits, which has seen a dramatic evolution as a labor cost over the years.

*Univ. of Cincinnati*, 867 F.Supp. at 1332 (record citations omitted.)

The plaintiff provider in *Univ. of Cincinnati* sought reconsideration of the district court's decision that HCFA did not arbitrarily and capriciously limit the employee benefits increase to the national 18.7 percent rate. The district court rejected to reconsider its decision:

> The applicable Medicare regulations require that, prior to the time a facility can receive an ESRD exception, such facility must show that the "elements of excessive cost are specifically attributable to" its atypical patient mix. 42 C.F.R. § 413.170(f)(6)(iii). In this case, plaintiff has not demonstrated that its higher fringe benefits costs, greater than the national, salary-to-benefits, average were directly attributable to an atypical patient mix.

---

[7] In *Univ. Of Cincinnati*, 867 F.Supp. at 1331, the district court found that HFCA "was not acting *contra* to the standards of 5 U.S.C. § 706(2)(A) when HFCA decided to only partially grant plaintiff's fringe benefits increase to reflect the national, benefits-to-salary, average for fringe benefits. Having approved a $39.47 per treatment increase to nursing salaries, it was not an abuse of discretion for the defendant to subsequently compute plaintiff's fringe benefit increase, as premised on the percentage to which nursing benefits are directly reflective of nursing fringe salaries. By so tying the fringe benefits increase to the nursing salary increase, the defendant, contrary to plaintiff's contentions, effectively put into practice the notion that one's fringe benefits are part and parcel of the labor cost for caring for an atypical patient mix."

14

*Univ. of Cincinnati v. Shalala*, 1995 WL 599188, at p. 2 (S.D. Ohio 1995).

On the issue of staleness of the 18.7 percent employee benefits rate, the district court remanded "this question to HCFA for it to determine and apply a national, benefits-to-salary, average that is more appropriately time-based and configured." *Univ. of Cincinnati*, 1995 WL 599188, at p. 2.

Like the plaintiff provider in *Univ. of Cincinnati*, CHW failed to substantiate that its higher employee benefits costs were attributable to atypical patient mix. CHW has failed to demonstrate that the 18.7 percent employee benefits rate is stale and that the HCFA Administrator arbitrarily and capriciously applied it. Despite the district court's comments in *Univ. of Cincinnati*, 867 F.Supp. 1332, the district court recognized on reconsideration that the matter was best left for HCFA to determine. As noted by HHS, in response to the 1995 remand, HHS re-evaluated the 18.7 percent employee benefits rate an found it valid. CHW incorrectly suggests that HHS improperly referred to matters outside the Administrative Record when HHS pointed to other court decisions. However, CHW casts doubts as to HHS arguments that CHW needed to resort to amended APA rulemaking to challenge the 18.7 percent employee benefits rate.

CHW argues that HHS has published no regulation or manual provision to require application of a median percentage figure to determine employee benefits for rate exception purposes. HHS responds that although no regulation limits the employee benefits rate to a national average, the PRM provides that HCFA "will use national data in evaluating the reasonableness of a provider's component costs." PRM section 2723.D. notes that "HCFA uses national data and general program statistics in evaluating the reasonableness of a facility's component costs shown in its exception request." CHW fails to demonstrate arbitrary or capricious action in the absence of a regulation or manual provision to require application of a median percentage figure.

CHW further argues that since HCFA permitted an increase to $72.59 in the salary component per treatment, it inconsistently limited employee benefits to $6.09. CHW attributes its higher employee benefits rate "to attract and maintain quality employee [sic] with the requisite skill level to care for Plaintiff's atypical ESRD patients." HHS responds that CHW failed to substantiate employee benefits based on 31.76 percent of salaries in that CHW did not "break out specific elements of its benefits that equate to 31.76 percent of salaries." HHS argues that HCFA granted CHW increased employee benefits

commensurate with the salary increase.

As noted by HHS and the HCFA Administrator, CHW failed to demonstrate that its costs in excess of the national average benefits rate were attributable to its patient population and failed to provide documentation to link excessive employee benefits costs beyond the 18.7 percent rate. As such, the fault rests with CHW, not the HCFA Administrator's application of the 18.7 percent employee benefits rate. Quite simply, CHW failed to substantiate employee benefits costs in excess of the national average with regards to atypical patient population. Increased salary costs, by themselves, do not support an increased employee benefits cost.

**Overhead Costs**

As part of CHW's $272.76 rate exception request, CHW allocated $111.96 to overhead (excluding employee benefits). The HCFA Administrator found that CHW failed to substantiate that excess overhead costs related to CHW's atypical patients and limited overhead costs to the $47 median rate amount.

CHW contends that the HCFA Administrator improperly applied a "directly attributable" standard in that CHW's "claimed overhead costs need only be consistent with general Medicare cost reimbursement." CHW contends that HHS lacks "reasonable basis for excluding all of [CHW's] overhead costs in excess of the median." CHW complains that HHS "provided no break-down of the $47 median overhead amount among the different items of overhead."

HHS responds that CHW "failed to demonstrate with convincing evidence that its claimed per treatment 'overhead' costs were reasonable and directly attributable" to atypical patient mix. HHS notes that excess overhead costs "are rarely justified" and points to PRM section 2725.1.4.:

> There are infrequent instances, (e.g., hepatitis) when an isolated area is required and when higher overhead costs may be justifiable. For these costs to be considered under this exception criteria, documentation must be submitted that identifies the basis of higher overhead costs, the specific cost components to be impacted, and the incremental per treatment costs. General statements regarding a facility's higher overhead costs are not acceptable in meeting the criteria.

CHW fails to substantiate its assertion that PRM section 2725.1.4. "is inconsistent with the ESRD exception regulations and need not be followed here" and that HHS prevents "additional payment for overhead in connection with an exception request." CHW points to no specifics to demonstrate that

16

it met requirements of 42 C.F.R. §§ 413.170(f), 413.184(a)(1) and PRM section 2725.1.4. More specifically, CHW fails to demonstrate with convincing objective evidence that its overhead costs are reasonable and allowable and that its per treatment cost in excess of its composite rate are directly attributable to atypical patient mix despite its claims that it patients dialyzed in bed to require more space and laundry. As to CHW's complaints of a lack of break down of the $47 overhead median, CHW fails to demonstrate the benefit of such break down. As noted by HHS, such breakdown would indicate only whether a provider exceeds the national median cost for a particular component, not that excess costs are attributable to atypical patient mix. CHW agrees with this point.

CHW contends that as to overhead costs, HHS violates a fundamental Medicare cost reimbursement principle to preclude cost shifting with an allocation of costs to CHW's dialysis unit reducing costs to others' dialysis units and resulting in a shift of costs to non-Medicare patients. HHS responds that cost shifting is a not at issue in the absence of evidence that such increased charges are allocated to non-Medicare patients. Moreover, HHS correctly notes the cost-shifting preclusion is much narrower than that advanced by CHW in that if CHW's position prevailed, "no cost could ever be disallowed for reimbursement purposes because to do so would tend to shift the cost to non-Medicare patients." *Pasadena Hosp. Ass'n v. United States*, 618 F.2d 728, 735 (Ct. Cl. 1980). The Ninth Circuit Court of Appeals has explained:

> In authorizing the Secretary to promulgate regulations establishing the methods to be used to determine reasonable cost, Congress expressly stated that such method must assure that "the necessary costs of efficiently delivering covered services . . . will not be borne by individuals not so covered . . ." 42 U.S.C. § 1395x(v)(1)(A)(I) (1976). The key point here is that Congress provided only that the cost of "covered" services should not be unfairly shifted to non-Medicare patients.

*North Clackamas Community Hosp. v. Harris*, 664 F.2d 701, 707 (9th Cir. 1980).

CHW fails to substantiate its assertion that HHS "contravenes" the rule that it "not shift Medicare patients' costs to non-Medicare patients or providers themselves." CHW's reliance on *County of Los Angeles v. Sullivan*, 969 F.2d 735, 741 (9th Cir. 1992) is dubious in that the Ninth Circuit addressed a Method B to reimburse "ancillary services" under "circumstances where hospitals [providers] were incapable of producing actual data" and accordingly, the providers did not "need to prove actual costs but may rely on . . . per diem averages and Method B's assumptions," "not actual data." The

methodology to determine ancillary costs in *Sullivan* proceeds under a much different regulatory scheme than overhead costs attributable to atypical patient mix at issue here.

## CONCLUSION AND ORDER

In sum, CHW fails to demonstrate that HHS action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.  CHW fails to persuade this Court to upset the deference to which HHS is entitled under the complex ESRD rate exception scheme setting standards of proof which CHW demonstrates are neither erroneous nor satisfied by CHW.  The HHS action is based on substantial evidence in the record as a whole and on proper legal standards.  As such, this Court:

1. AFFIRMS the HFCA Administrator's and HHS final decision on CHW's ESRD rate exception request and DENIES CHW's requested relief; and
2. DIRECTS this Court's clerk to enter judgment in favor of defendant Michael O. Leavitt, Secretary of the United States Department of Health and Human Services, and against plaintiff Catholic Health Care West and to close this action.

IT IS SO ORDERED.

**Dated:   May 5, 2006**                      /s/ Lawrence J. O'Neill
66h44d                                           UNITED STATES MAGISTRATE JUDGE